b

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## ALEXANDRIA DIVISION

| | |
|---|---|
| KIMBERLY ARMSTRONG, ET AL.,<br>Plaintiffs | CIVIL DOCKET NO. 1:21-CV-04368 |
| VERSUS | DISTRICT JUDGE SUMMERHAYES |
| ABC CORPORATION, ET AL.,<br>Defendants | MAGISTRATE JUDGE PEREZ-MONTES |

## REPORT AND RECOMMENDATION

Before the Court is a Motion to Dismiss filed by Defendant Biotronik, Inc. ECF No. 26.

Because Plaintiffs' claims for design defects and inadequate warnings as to potential defects in the product are expressly preempted, Biotronik's Motion to Dismiss (ECF No. 26) should be GRANTED IN PART, and those claims should be DISMISSED WITH PREJUDICE.

Because Plaintiffs' claims as to construction and composition (manufacturing) and inadequate warnings due to Biotronik's asserted failure to comply with FDA procedures for documentation and notification of adverse events are not preempted and are adequately alleged, Biotronik's Motion to Dismiss (ECF No. 26) should be DENIED IN PART as to those claims.

And because Plaintiffs' express warranty claim is conclusory and vague, Biotronik's Motion to Dismiss (ECF No. 26) as to that claim should be GRANTED IN PART, and that claim should be DISMISSED WITHOUT PREJUDICE.

Because the case is ready for normal discovery, IT IS RECOMMENDED that Plaintiffs' Motion for Limited Discovery (ECF No. 30) be DENIED.

## I.    Background

Plaintiffs Kimberly Armstrong and Gabrielle Armstrong ("the Armstrongs"), wife and daughter of the decedent, David Armstrong, filed a wrongful death and survival action against Biotronik, Inc. and its insurer in the Louisiana Ninth Judicial District Court in Rapides Parish in September 2021.   ECF No. 1-2 at 25.    The Armstrongs seek damages pursuant to the Louisiana Products Liability Act ("LPLA"), La. R.S. 9:2800.51, *et seq*.

Biotronik removed, alleging diversity.   ECF No. 1.   Biotronik asserts the Armstrongs are citizens of Louisiana.   ECF No. 1 at 2.   Biotronik is incorporated in Delaware and has its principal place of business in Oregon.   ECF No. 1 at 2.[1]

David Armstrong suffered from ischemic cardiomyopathy with congestive heart failure.   ECF No. 1-2 at 7.   The Armstrongs allege that, in 2017, David Armstrong was surgically implanted with: a dual chamber Automatic Implantable Cardioverter Defibrillator ("AICD"), model Iperia 7 DR-T (s/n 60916485); right

---

[1] The citizenship of ABC Insurance, a fictitious name, is disregarded for purposes of removal.

ventricular lead model Protego S65 (s/n 49503055); and right atrial lead model Solia S53 (s/n 49537826), all of which were manufactured, distributed, marketed, and sold by Biotronik. ECF No. 1-2 at 7; 12-2.

In August 2020, David Armstrong suffered an acute myocardial infarction and died. ECF No. 1-2 at 7. Plaintiffs allege that a cause of Armstrong's injuries was the negligence of Biotronik in the manufacture of the Iperia 7 DR-T.

The Biotronik Iperia 7 DR-T device implanted in David Armstrong was recalled in March 2021[2] for premature depletion of the battery.[3] ECF No. 1-2 at 8. The Armstrongs discovered the recall in May 2021. ECF No. 1-2 at 8.

The Armstrongs filed this action against Biotronik, alleging claims under the LPLA about the Iperia 7 DR-T (ECF No. 1-2 at 25; No. 25):

(1) The product was unreasonably dangerous in construction or composition because it was not manufactured in accordance with its federally approved design, resulting in the potential for lithium plating and premature battery depletion and/or causing the elective replacement indicator to not function as designed.

(2) The product was unreasonably dangerous in construction or composition because the material chosen by Biotronik were not adequate for manufacture consistent with the federally approved

---

[2] *See* March 2021 Biotronik Urgent Field Safety Notice – Potential premature battery depletion in a subset of ICD and CRT-D devices, a*vailable at* https://www.biotronik.com/sites/default/files/2021-03/BIOTRONIK%20Field%20Safety%20Notice%20March%202021.pdf. ECF No. 12-1.

[3] The Iperia serial number on David Armstrong's defibrillator was not included in the United States Food and Drug Administration's ("FDA's") Iperia recall notice. *See* Class 2 Device Recall Biotronik Iperia, at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfRes/res.cfm?id=186291.

design, resulting in the potential for lithium plating and premature battery depletion and/or causing the elective replacement indicator to not function as designed.

(3) The product was unreasonably dangerous because it contained a manufacturing defect which included the failure to properly inspect manufactured devices or adopt quality control measures regarding the battery, to ensure the batteries would not undergo the foreseeable development of lithium plating.

(4) The product was unreasonably dangerous in design because the battery was susceptible to lithium plating resulting in premature failure.

(5) The product was unreasonably dangerous because an adequate warning about the product was not provided to physicians and end users that the elective replacement indicator in the device would not provide sufficient warning of the impending failure to the device and that the battery was susceptible to premature depletion.

(6) The product was unreasonably dangerous because an adequate warning about the product was not provided to physicians and end users of the foreseeable complication of lithium plating and to advise users to monitor deices for the detectable indicators of lithium plating and/or recommend prophylactic replacement.

(7) The product was unreasonably dangerous because it did not conform to the manufacturer's express warranty about the longevity of the product (up to 11 years).

(8) Biotronik violated the Medical Device Reporting regulations and post-approval reporting requirements by failing to timely notify the FDA of observed instances of lithium plating and resulting premature battery depletion in Iperia AICD devices and failing to establish a policy for documenting adverse events and report them to the FDA.

(9) Biotronik violated the FDA quality system requirements by failing to develop, conduct, control, and monitor production processes to ensure good workmanship and to ensure the Iperia battery conformed to specifications, including but not limited to failure to

adopt standard operating procedures, monitoring, compliance with standards and codes, good workmanship and testing, and failure to control conditions that affected the quality of the lithium battery.

Plaintiffs also generally assert other failures and defects that may be developed relating to the Protego S65 and Solia S53 leads connected to the Iperia device.  ECF No. 1-2 at 26.  The Armstrongs request a trial and seek damages and costs.

Biotronik filed a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  ECF No. 3.  Plaintiffs opposed that Motion and, alternatively, filed a Motion to Amend. ECF No. 12. Plaintiffs' Motion to Amend was granted and Defendants' Motion to Dismiss was denied without prejudice to its right to refile at a later date.  ECF No. 23.

Plaintiffs filed an Amended Complaint. ECF No. 25.  Biotronik then filed a second Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  ECF Nos. 26, 30. Plaintiffs oppose that motion.  ECF No. 29.

## II.  Law and Analysis

Biotronik argues that, because the Iperia 7 DR-T is a Class III medical device that underwent the United States Food and Drug Administration's ("FDA") premarket approval ("PMA") process, and Plaintiffs have failed to allege parallel state law claims, Plaintiff's LPLA claims are expressly preempted by the Medical Device Amendments of 1976 ("MDA"), 21 U.S.C. § 360k(a), to the Federal Food, Drug

and Cosmetics Act, 21 U.S.C. §§ 321-394.[4]  Alternatively, Biotronik argues that Plaintiffs have failed to state claims under the LPLA.  ECF No. 26.

### A.    A court may dismiss inviable claims.

A court may grant a motion to dismiss for "failure to state a claim upon which relief can be granted" under Fed. R. Civ. P. 12(b)(6).  "[A] complaint will survive dismissal for failure to state a claim if it contains 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Legate v. Livingston*, 822 F.3d 207, 210 (5th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

The court must view all well-pleaded facts in the light most favorable to the plaintiff.  *See Yumilicious Franchise, L.L.C. v. Barrie*, 819 F.3d 170, 174 (5th Cir. 2016).  Plausibility is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *King v. Baylor University*, 46 F.4th 344, 355–56 (5th Cir. 2022) (citing *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556)).

The reviewing court "must accept all well-pleaded facts as true, and ... view them in the light most favorable to the plaintiff."  *King v. Baylor University*, 46 F.4th

---

[4] Biotronik argues only that express preemption applies in this case, and does not discuss implied preemption.

6

344, 355–56 (5th Cir. 2022) (citing *Walker v Beaumont Independent School District*, 938 F.3d 724, 735 (2019)). But courts "do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *King v. Baylor University*, 46 F.4th 344, 355–56 (5th Cir. 2022) (citing *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005)).

**B.** **The MDA establishes systematic federal oversight for medical devices.**

The MDA imposed a regime of detailed federal oversight for medical devices, including an express preemption provision. *See Riegel v. Medtronic, Inc.*, 552 U.S. 312, 316 (2008). Under the MDA, a medical device manufacturer is protected from liability for state-law tort claims related to a defective or dangerous device to the extent that the manufacturer has complied with federal statutes and regulations. *See Hughes v. Boston Scientific Corp.*, 631 F.3d 762, 767 (5th Cir. 2011) (*citing Riegel, supra*, and *Medtronic, Inc. v. Lohr,* 518 U.S. 470 (1996)). However, a manufacturer is not protected when the claim is based on the manufacturer's violation of applicable federal requirements. *See id.*

The regulatory regime establishes various levels of oversight for medical devices intended for human use, depending on the risks they present. *See* 21 U.S.C. § 360c. "Class I devices are those deemed not to present a potential unreasonable risk of illness or injury. Class II devices are those for which special performance standards are required to assure safety and effectiveness. Class III devices are those for which no special controls can assure reasonable safety and effectiveness; therefore

premarket approval must be obtained from the FDA before these devices may be marketed." *See Borskey v. Medtronics, Inc.*, 1995 WL 120098, at *1 (E.D. La. 1995), *aff'd in part*, 105 F.3d 651 (5th Cir. 1996); 21 U.S.C.360c(1).

Class I, which includes such devices as elastic bandages and examination gloves, is subject to the lowest level of oversight: "general controls," such as labeling requirements. *See* 21 U.S.C. § 360c(a)(1)(A); *Riegel*, 552 U.S. at 316. Class II includes such devices as powered wheelchairs and surgical drapes, and may also include "a device that is purported or represented to be for a use in supporting or sustaining human life." *See* 21 U.S.C. § 360c(a)(1)(B); *Riegel*, 552 U.S. at 316–17. A Class II device is subject to both general controls and "special controls" such as performance standards and post market surveillance measures. *See id.*

The devices receiving the most federal oversight are those in Class III, which are "purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health," or which "presents a potential unreasonable risk of illness or injury." *See* 21 U.S.C. § 360c(a)(1)(C); *Riegel*, 552 U.S. at 317. Class III includes replacement heart valves, implanted cerebella stimulators, and pacemaker pulse generators. *See Riegel*, 552 U.S. at 317. In general, a device is assigned to Class III if it cannot be established that a less stringent classification would "provide reasonable assurance of its safety and effectiveness." *Riegel,* 552 U.S. at 317 (quoting 21 U.S.C. § 360c(a)(1)(C)); *Celino,* 536 F. Supp. 3d at 99. Class III devices are highly regulated

8

and must undergo a PMA process pursuant to 21 U.S.C. 360e.[5]    21 U.S.C. § 360c(a)(1)(C); *see also Riegel,* 552 U.S at 317–18; *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 343–45 (2001); *Celino v. Biotronik,* 536 F. Supp. 3d 89, 99 (E.D. La. 2021).

For a device that is "substantially equivalent" to another device exempt from premarket approval, an alternative approval process is set forth in 21 U.S.C. § 510(k). *See* 21 U.S.C. 360c(f)(1)(A); *Reddick v. Medtronic, Inc.*, 2022 WL 715494, at \*2 (5th Cir. 2022) (*citing Riegel,* 552 U.S. at 317).    Most new Class III devices enter the market through the § 510(k) process.    *Riegel*, 552 U.S. at 317.    Thus, the PMA process is not required if the application is submitted under § 510(k).    *See Celino,* 536 F. Supp. 3d at 99 (*citing Bass v. Stryker Corp.*, 669 F.3d 501, 506–07 (5th Cir. 2012)).

As set forth below, state law tort claims may be either expressly preempted by the MDA, or impliedly preempted by 21 U.S.C. § 337.

---

[5] PMA requires that manufacturers provide the FDA with "reasonable assurance" their devices are both safe and effective. *See* 21 U.S.C. § 360e(c)(1)(A). The FDA expends around 1,200 hours reviewing a typical application. *See Riegel*, 552 U.S. at 318 (citing *Lohr*, 518 U.S. at 477).    Once a Class III device receives PMA, its manufacturer is forbidden from making any changes to the design specifications, manufacturing process, labeling, or any other attribute that would affect the product's safety or effectiveness, absent supplemental FDA approval.    *See id.* at 319.    Supplemental review is evaluated under largely the same criteria as the initial application—distinguishing it from the § 310(k) process discussed *supra. See Bass*, 669 F.3d 501, 508 (5th Cir. 2012).

### C.   Preemption of claims under the MDA

#### 1.   Express Preemption

To help the FDA maintain regulatory authority over medical devices, Congress enacted 21 U.S.C. § 360k(a), which expressly preempts state-law tort claims for injury caused by a medical device if "(1) 'the Federal Government has established requirements applicable to [the device]'; and (2) the claims are based on state-law requirements that are 'different from, or in addition to, the federal ones, and that relate to safety and effectiveness.'" *Bass*, 669 F.3d at 507 (quoting *Riegel*, 552 U.S. at 321–22); *see also Naquin v. Medtronic, Inc.,* 2021 WL 4848838, at *2 (5th Cir. 2021); 21 U.S.C. § 360k(a).

However, "§ 360k does not prevent a State from providing a damages remedy for claims premised on a violation of FDA regulations; the state duties in such a case 'parallel,' rather than add to, federal requirements." *Naquin v. Medtronic, Inc.*, 2021 WL 4848838, at *3 (5th Cir. 2021) (*citing Riegel*, 552 U.S. at 330); *see also Wildman v. Medtronic, Inc.,* 874 F.3d 862, 867 (5th Cir. 2017) (citing *Riegel*, 552 U.S. at 330).

The United States Supreme Court has concluded that Class III devices that undergo the PMA process automatically satisfy the first prong of the *Riegel* preemption analysis because the FDA requires them "to be made with almost no deviations from the specifications in [the relevant] approval application," and because it has "determined that the approved form provides a reasonable assurance of safety

and effectiveness." *Riegel*, 552 U.S. at 323; *see also Gomez v. St. Jude Medical Daig Division Inc.*, 442 F.3d 919, 930 (5th Cir. 2006).

Class III devices that have undergone the PMA process are distinguishable from Class III products that are submitted for approval under the § 510(k) approval process instead. Devices that underwent the § 510(k) approval process do not get the benefit of preemption because that process "does not impose federal requirements on a device." *Bass*, 669 F.3d at 507 (citing *Lohr*, 518 U.S. at 493–94); *see also Reddick*, 2022 WL 715494, at *2 ("[T]he § 510(k) approval process does not impose federal requirements on a device.").

## 2.   Implied Preemption

In addition to express preemption under 21 U.S.C. § 360k(a), there is also implied preemption under 21 U.S.C. § 337(a). Implied preemption bars a plaintiff's claims if the claims are based *solely* upon a violation of federal law. *See Buckman Co.*, 531 U.S. at 353; *see also Wildman*, 874 F.3d at 868. "[I]t is the Federal Government rather than private litigants who are authorized to file suit for noncompliance with the medical device provisions . . . ." *See Buckman Co.*, 531 U.S. at 349 n. 4 (*citing* 21 U.S.C. § 337(a)); *see also Riegel*, 552 U.S. at 321; *Vesoulis v. ReShape LifeSciences, Inc.*, 2022 WL 989465, at *4 (5th Cir. 2022); *Celino*, 536 F.Supp.3d at 98–99. A state law claim, based on traditional state tort law, avoids implied preemption. *See Gavin v. Medtronic, Inc.,* 2013 WL 3791612, at *5 (E.D. La. 2013) (citing *Buckman,* 531 U.S. at 353).

11

The "paradigmatic" claim barred by implied preemption is "fraud in connection with the FDA approval process."  It "cannot be brought under state law because the FDA is the exclusive enforcer of its regulations."  *Wildman*, 874 F.3d at 868, n. 6 (*citing Buckman Co.,* 531 U.S. at 347-50).  "But implied preemption does not apply to common law claims that would reach the alleged wrong independent of the FDA process."  *Wildman*, 874 F.3d at 868 n. 6 (*citing Buckman Co.,* 531 U.S. at 352).

### 3.    Louisiana Products Liability Act

Because the Court's jurisdiction is based on diversity, it is bound by the substantive law of Louisiana, the forum state.  *See Celino*, 536 F. Supp. 3d at 98-99 (*citing Learmonth v. Sears, Roebuck & Co.*, 710 F.3d 249, 258 (5th Cir. 2013)).[6]  The Louisiana Products Liability Act ("LPLA"), La. R.S. 9:2800.51, *et seq.,* "establishes the exclusive theories of liability" under Louisiana law against manufacturers "for damage caused by their products."  La. R.S. 9:2800.52.

Thus, to avoid preemption, Plaintiffs must state a claim under the LPLA that is parallel to a federal law claim.

_____

[6] In *Celino*, 536 F. Supp. 3d at 98-99, the Plaintiffs alleged wrongful death and survival actions under the LPLA, due to an allegedly defective defibrillator manufactured by Biotronik (not the same model as the one herein).  In *Celino,* the first implanted Biotronik defibrillator's battery depleted and the defibrillator began producing "unnecessary shocks."  That defibrillator was replaced by a second Biotronik defibrillator that had a disconnected wire and broken lead, necessitating further surgery.  A third defibrillator implanted, but the deceased passed away two months after that surgery due to complications.

The LPLA provides that a product is unreasonably dangerous only if: (1) the product is unreasonably dangerous in construction or composition; (2) the product is unreasonably dangerous in design; (3) the product is unreasonably dangerous because an adequate warning about the product has not been provided; or (4) the product is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product. *See* La. R.S. 9:2800.54(B); *see also Flagg v. Stryker Corp.*, 647 Fed. Appx. 314, 316 (5th Cir. 2016); *Gavin, Inc.,* 2013 WL 3791612, at *5.

### 4.    Plaintiffs' Burden of Proof

"Thus, in order for a claim to fit through the narrow gap available between express and implied preemption, a plaintiff must allege that a well-recognized duty owed under state law was breached by a manufacturer's conduct that violates the FDA. In other words, for a state law claim to survive both express and implied preemption, 'the claim must be premised on conduct that both (1) violates the FDA and (2) would give rise to a recovery under state law even in the absence of the FDA.'" *See Gavin.,* 2013 WL 3791612, at *5 (citing *Buckman,* 531 U.S. at 353).

"Even if a state law claim is parallel, a district court may still dismiss it if the claim is 'impermissibly conclusory and vague.'" *McGuire v. Abbott Laboratories, Inc.*, 2022 WL 4295402, at *5 (E.D. Tex. 2022) (*quoting Reddick*, 2022 WL 715494, at *2). "[T]o plead a parallel claim successfully, a plaintiff's allegations that the

manufacturer violated FDA regulations must meet the *Twombly* plausibility standard." *Bass*, 669 F.3d at 509.

**D.**    **Biotronik's Motion to Dismiss should be granted in part and denied in part.**

Biotronik argues that Plaintiffs' claims are expressly preempted by the MDA, 21 U.S.C. § 360c *et seq.* because: (1) the Iperia 7 DR-T is a Class III medical device; (2) that underwent the FDA's premarket approval ("PMA") process; and (3) Plaintiffs failed to allege state law violations that parallel federal law.[7]

Biotronik contends the Iperia 7 DR-T is presumed to satisfy the first prong of the preemption analysis because it is a Class III device that underwent the PMA process.  *See Riegel,* 552 U.S. at 321–22 (Class III devices that undergo the PMA process automatically satisfy the first prong of the *Riegel* preemption analysis because the FDA requires them "to be made with almost no deviations from the specifications in [the relevant] approval application," and because it has "determined that the approved form provides a reasonable assurance of safety and effectiveness").

---

[7] In considering Biotronik's arguments, the Court takes judicial notice of certain documents that are attached to the Amended Complaint or incorporated into the complaint by reference (ECF No. 25), or that are publicly available through the FDA (some of which are attached to the briefs).  *Compare Yosowitz v. Covidien L.P.,* 182 F. Supp. 3d 683, 687-88 (S.D. Tex. 2016) (*citing Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2013); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)); *Sons v. Medtronic Inc.,* 915 F. Supp. 2d 776, 781 (W.D. La. 2013).

1.     **Because the Iperia 7 DR-T is a Class III device that underwent the PMA process, Biotronik automatically satisfies the first prong of the *Reigel* preemption analysis.**

Biotronik asserts that the Iperia 7 DR-T is a Class III medical device.  ECF No. 3-1 at 5; No. 26-1 at 3.  Plaintiffs agree with that assertion.  ECF No. 25 at 2-3, ¶ 5.

The first prong of *Riegel* requires Biotronik to show the federal government has "established requirements applicable to [the medical device]."  *Reddick*, 2022 WL 715494, at *2–3.  That requirement may be met by showing the Iperia 7 DR-T is Class III device that went through the PMA process.  *See Riegel*, 552 U.S. at 323.

The Iperia 7 DR-T dual chamber implantable defibrillator appears to satisfy the definition of a Class III device.  *See Riegel*, 552 U.S. at 317 (Class III devices "include replacement heart valves, implanted cerebella stimulators, and pacemaker pulse generators").  However, Class II also includes medical devices that are "purported or represented to be for a use in supporting or sustaining human life."  21 U.S.C. § 360c(1)(B).

In March 2021, Biotronik issued a recall on several of its defibrillators, including the Iperia 7 DR-T implantable cardioverter defibrillator, due to premature battery depletion events.[8]  ECF No. 25-2.  The FDA's April 21, 2021 recall notice for

---

[8] Biotronik's Field Safety Notice, attached to the Amended Complaint (ECF No. 25-2) and cited in the FDA's recall notice (ECF No. 25-1), asserted there had been confirmed premature battery depletion events due to lithium deposition on the battery anodes, known as lithium plating, and noted that the devices had been distributed since 2013.    *See* https://www.biotronik.com/sites/default/files/2021-03/BIOTRONIK%20Field *%20Safety%20Notice%20March%202021.pdf.*

the Iperia 7 DR-T is titled "Class 2 Device Recall Biotronik Iperia" and describes the device as an implantable, dual-chamber defibrillator.[9]  ECF No. 25-1 at 1.  However, other FDA notices, as to problems with the total product life cycle, describe the device as Class III.[10]  For purposes of this motion, the Court accepts the parties' assertion that the Iperia 7 DR-T is a Class III medical device.

Biotronik also asserts that the Iperia 7 DR-T went through the PMA process and, thus, is entitled to the benefit of federal preemption.  ECF No. 26-1 at 3.  Plaintiffs also do not challenge that assertion.

In its Motion to Dismiss, Biotronik submitted a 2015 PMA from the FDA to show the Iperia 7 DR-T went through the PMA process.  ECF No. 26-1 at 2.  However, that 2015 PMA is actually a "supplement type" PMA, for approval of a modification to the Iperia Family ICD/CRT-D: Iperia, Itrevia, and Inventra (implantable, dual-chamber defibrillators) ICD and CRT-D.  ECF No. 26-1 at 2.  It does not appear to be the original PMA for the Iperia 7 DR-T.[11]  To add to the confusion, the  2015 supplemental PMA provided by Biotronik links to an "original PMA" that is not for an Iperia device.  ECF No. 25-1 at 5.

---

[9] *See https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfRes/res.cfm?id=186291.*

[10] *See  https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfTPLC/tplc.cfm?id=1072.*

[11] A cursory look at the FDA's website did not reveal either a premarket approval or a 510(k) approval.  Biotronik is in the best position to produce that evidence.

The FDA's Device Recall for the Biotronik Iperia lists a PMA number that also links to a PMA supplement. That PMA Supplement states that "[a] supplement may have changed the device description/function or indication from that approved in the original PMA" and that one must look for the original PMA record for more information. The PMA Supplement further states that it is for a "change design/components/specifications/material."[12]  The supplemental PMA links to an "original PMA" that is for the "Tupos Lviatx & Kronos LV-T CRT-D & Corox OWT Steroid LV Pacing Lead" – not to the Iperia. The Summary of that PMA states the changes/supplement were for approval to allow "full body (MRI) scanning of their ProMRI ICD systems" and appears to involve changes in the leads.[13]

The Court accepts, for purposes of this motion, that the Iperia 7 DR-T underwent the PMA process (rather than the 510(k) approval process). Because the Iperia 7 DR-T underwent the PMA process, Biotronik automatically meets the first prong of the *Reigel* test. *See Naquin,* 2021 WL 4848838, at *2 (citing *Bass,* 669 F.3d at 507).

### 2. <u>Plaintiffs allege some parallel state law claims that are not preempted.</u>

The second prong asks whether the plaintiff's state law claims impose requirements "that are different from, or in addition to, the federal ones, and that

---

[12] *See* https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?ID=P050023S087.

[13] *See* https://www.accessdata.fda.gov/cdrh_docs/pdf5/P050023S087M.pdf.

relate to safety and effectiveness." *Naquin,* 2021 WL 4848838, at *2 (quoting *Riegel,* 552 U.S. at 322). State law claims that are premised on a violation of FDA regulations are "parallel" to federal requirements and are not preempted. *See Reigel,* 552 U.S. at 330; *see also Rodriguez v. American Medical Systems, Inc.*, 597 Fed. Appx. 226, 228 (5th Cir. 2014); *Bass,* 669 F.3d at 510-12 (5th Cir. 2012); *McGuire,* 2022 WL 4295402, at *5 ("[T]he state duties in such a case 'parallel,' rather than add to, federal requirements."). "These are called 'parallel' claims because they enforce FDA regulations rather than add to or undermine them." *Wildman*, 874 F.3d 867 (*citing Riegel*, 552 U.S. at 330). Therefore, to state a valid parallel claim that is not expressly preempted by § 360k(a) or impliedly preempted by § 337(a), a plaintiff must demonstrate: (1) that Defendants violated FDA regulations and requirements; and (2) how that conduct breaches a well-recognized state duty. *See Gavin*, 2013 WL 3791612, at *17.

### a. Plaintiffs' construction and composition (manufacturing) defect claims are not preempted and are adequately stated.

The Armstrongs contend the Iperia 7 DR-T (and its leads) were unreasonably dangerous in manufacturing, or construction and composition. Specifically, Plaintiffs claim the product was unreasonably dangerous because:

(1) It was not manufactured in accordance with its federally approved design, resulting in the potential for lithium plating and premature battery depletion and/or causing the elective replacement indicator no to function as designed; and

18

(2)  The materials used by Biotronik were inadequate to manufacture the device in accordance with its federally approved design, resulting in the potential for lithium plating and premature battery depletion and/or causing the elective replacement indicator no to function as designed.

(3) the product was unreasonably dangerous because it contained a manufacturing defect which included the failure to properly inspect manufactured devices or adopt quality control measures regarding the battery, to ensure the batteries would not undergo the foreseeable development of lithium plating;

(4) Biotronik violated the FDA quality system requirements by failing to develop, conduct, control, and monitor production processes to ensure good workmanship and to ensure the Iperia battery conformed to specifications, including but not limited to failure to adopt standard operating procedures, monitoring, compliance with standards and codes, good workmanship and testing, and failure to control conditions that affected the quality of the lithium battery.

Any claim asserting a state-law tort action despite compliance with FDA regulations is preempted by the MDA. *See Bass*, 669 F.3d at 509 (*citing Hughes*, 631 F.3d at 768). But if a plaintiff pleads that a manufacturer of a Class III medical device failed to comply with the specific processes and procedures that were approved by the FDA and that this failure caused the injury, the plaintiff will have pleaded a parallel claim. *See Bass*, 669 F.3d at 512. A formal finding of a violation by the FDA is not required to plead a parallel action. *See id.* (*citing Hughes,* 631 F.3d at 772).

Plaintiffs specifically contend that Biotronik failed to follow the FDA-approved design, failed to use the correct materials, and failed to follow good manufacturing practices in making the Iperia 7 DR-T, which resulted in lithium plating and caused premature depletion of the battery. Because Plaintiffs allege manufacturing defects

due to Biotronik's failure to comply with FDA regulations and requirements, their claims for manufacturing defects are not expressly preempted. And because Plaintiffs assert their claims under the LPLA, their claims are not subject to implied preemption.

Biotronik also argues that Plaintiffs failed to adequately allege their state law claims.

Under the LPLA, in order to prove a construction or composition defect at trial, a plaintiff must show that "at the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer." *Flagg*, 647 Fed. Appx. at 316 (*citing* La. R.S. 9:2800.55).

The Fifth Circuit has held that to successfully plead a parallel state-law claim, the plaintiff must allege that "a manufacturer of a Class III medical device failed to comply with either the specific processes and procedures that were approved by the FDA or the CGMPs [*i.e.*, the FDA's Current Good Manufacturing Practices] themselves *and* that this failure caused the injury."[14]  *Bass*, 669 F.3d at 512.  A

---

[14] "The FDA requires manufacturers of Class III devices to comply with Current Good Manufacturing Practices ("CGMP"). Class III devices not satisfying CGMP requirements are adulterated." *Purcel v. Advanced Bionics Corp.*, 2010 WL 2679988, at *2 (N.D. Tex. 2010) (citing 21 U.S.C. § 351(h)).

complaint will be insufficient when it fails to: (1) specify the manufacturing defect; (2) specify a causal connection between the failure of the specific manufacturing process and the specific defect in the process that caused the personal injury; and (3) state how the manufacturing process failed, or it deviated from, the FDA approved manufacturing process. *See Naquin* 2021 WL 4848838, at *3.

"[I]f a plaintiff pleads that a manufacturer of a Class III medical device failed to comply with either the specific processes and procedures that were approved by the FDA or the [FDA's Current Good Manufacturing Practices] and that this failure caused the injury, the plaintiff will have pleaded a parallel claim." *Rodriguez*, 597 Fed. Appx. at 229 (*quoting Bass,* 669 F.3d at 512). A formal finding of a violation by the FDA is not required to plead a parallel action. *See Bass*, 669 F.3d at 509 (*citing Hughes,* 631 F.3d at 772-73).

"[A] complaint that does not 'specify the manufacturing defect,' 'specify a causal connection between the failure of the specific manufacturing process and the specific defect in the process that caused the personal injury,' or 'tell us how the manufacturing process failed, or how it deviated from the FDA approved manufacturing process' is insufficient to state a parallel products liability claim." *Reddick*, 2022 WL 715494, at *2 (affirming a summary judgment).[15]

---

[15] *See also Rodriguez*, 597 Fed. Appx. at 230 (affirming a summary judgment holding the plaintiff failed to state a parallel manufacturing or design defect claim when his complaint did not plead a violation of any federal requirement relating to design or manufacturing of the implant and he did not allege a specific defect in the manufacturing process or design, any deviation from the FDA-approved design or manufacturing processes, or any causal

In *Flagg,* the United States Court of Appeals for the Fifth Circuit discussed the pleading requirements for LPLA claims in a federal complaint.  "The question is whether Flagg has plausibly alleged enough information that, *with discovery,* he could prove the Manufacturing Defendants are liable under the LPLA." *Flagg,* 647 Fed. Appx. at 319; *see also Kaylor v. Eisai,* 2022 WL 983657, at *3-*4 (W.D. La. 2022); *Dixon v. Spurlin,* 2019 WL 4898664, at *4 (W.D. La. 2019), *report and recommendation adopted in part*, 2019 WL 4898663, at *1 (W.D. La. 2019); *Landry v. NuVasive Inc.,* 2017 WL 889836, at *4 (W.D. La. 2017), *report and recommendation adopted,* 2017 WL 889744 (W.D. La. 2017).  The Fifth Circuit concluded that Plaintiffs' allegations provided sufficient information to raise a reasonable expectation that discovery would reveal evidence to support the manufacturing defendants' liability, *see Flagg,* 647 Fed. Appx. at 317, and this raised the right to relief above the speculative level, *see Flagg,* 647 Fed. Appx. at 319.

The Armstrongs contend David Armstrong's injury occurred when the defibrillator failed due to the early depletion of the battery, and that early battery depletion was the basis for the recall of the defibrillator.  In support of those claims, Plaintiffs' Amended Complaint further asserts that, in 2016, after Biotronik received

---

connection between a violation of federal requirements and his injuries); *Funk*, 631 F.3d at 782 (affirming the ruling on a motion to dismiss that held the plaintiff's pleadings were too conclusory to state a parallel claim when the complaint did not specify the manufacturing defect, a causal connection between a failure of the manufacturing process or a specific defect in the process that caused the personal injury, or how the process deviated from the FDA-approved manufacturing process).

FDA approval and began selling the Iperia DR-T devices, it received a letter of warning from the FDA finding that Biotronik had failed to establish and maintain procedures to ensure adequate sampling methods and that Biotronik failed to control conditions that affected product quality.  ECF No. 25 at 3, ¶ 6.  Plaintiffs further assert that the recall notices show that Biotronik acknowledged the battery (in the recalled devices) failed earlier than its expected lifespan and failed to conform to the construction, composition, and design standards submitted by Biotronik to the FDA. ECF No. 25, ¶ 14.

Plaintiffs submitted Biotronik's voluntary recall notice and the FDA's recall notice, both of which warned of the occurrence of lithium plating resulting in premature battery depletion.  There was also a defect in the "elective replacement indicator," which failed to provide warning of the battery depletion.  *Compare Bass v. Stryker Corp.*, 669 F.3d 501, 509 (5th Cir. 2012) (Bass pleaded sufficient facts to find that his injury plausibly resulted from a violation of FDA standards in connection with his manufacturing defect claims, where he: alleged the FDA had previously warned Stryker of a violation of FDA regulations; Stryker recalled its product after Bass's implant surgery; and Bass suffered from a known effect of the product defect); *contra Rodriguez*, 597 Fed. Appx. at 230 (Rodriguez's complaint failed to state a parallel claim because: he failed to plead a violation of any federal requirement relating to design or manufacturing of the implant; he cited no facts supporting a finding of any such violation; and he failed to allege a specific defect in the

manufacturing process or design, any deviation from the FDA-approved design or manufacturing processes, or any causal connection between a violation of federal requirements and his injuries); *Murphy v. Boston Scientific Corp.*, 2018 WL 4870700, at *7 (M.D. La. 2018), *report and recommendation adopted in pertinent part*, 2018 WL 6046178 (M.D. La. 2018) (Plaintiff's complaint: failed to specify which FDA standards, with respect to the manufacturing, design, or labeling, were allegedly violated; and failed to allege a specific defect in the manufacturing process or design, a deviation from the FDA-approved design or manufacturing processes, or any causal connection between a violation of federal requirements and his injuries).

Plaintiffs further assert that "the fact that defendant's corrective action was classified as a recall means the FDA had determined that defendant's activities constituted a violation of FDA regulations and/or other federal law."  Plaintiffs cite 21 C.F.R. 7.40(a), because "[r]ecall is an alternative to FDA-initiated court action for removing or correcting violations."  ECF No. 25 at 4, ¶ 11.  Pursuant to 21 C.F.R. § 7.46, when the FDA classified Biotronik's "Urgent Field Safety Notice" as to the defects in the Iperia 7 DR-T as a "recall,"[16] the FDA had found the product to be in violation of federal law and subject to legal action by the FDA.

Plaintiffs allege sufficient facts to find that David Armstrong's injury plausibly resulted from a violation of FDA standards in connection with his manufacturing

---

[16] *See* https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfRes/res.cfm?id=186291.

defect claims.   Plaintiffs provide sufficient information to "raise a reasonable expectation that discovery will reveal evidence" to support Biotronik's liability for unreasonably dangerous construction or composition, and to raise the Armstrongs' right to relief above the speculative level.

Because Plaintiffs have adequately stated LPLA claims for unreasonably dangerous construction or composition, and those claims are not preempted, Defendants' Motion to Dismiss (ECF No. 3) those claims should be denied.

### b.    <u>Plaintiffs' claim for defective product design is expressly preempted.</u>

Plaintiffs also contends the product design was defective:

> The product design was susceptible to lithium plating resulting in premature failure as evidenced by the recall based on device design.

Where, through the PMA process, the FDA approved a product design, federal law preempts a state law challenge to an FDA- approved product design. *See Gomez,* 442 F.3d at 930 ("To permit a jury to second-guess the . . . design by applying the Louisiana statutory standard for unreasonably dangerous design would risk interference with the federally-approved design standards and criteria.").

Plaintiffs do not contend the device's design was not approved by the FDA.  In fact, Plaintiffs specifically concede the device is a Class III device, and did not controvert Biotronik's claim that it went through the PMA process.  Therefore, the Iperia 7 DR-T design was approved by the FDA.  Accordingly, Plaintiffs' defective design claim is expressly preempted by the MDA.

25

Because Plaintiffs' defective design claims are preempted, Defendants' Motion to Dismiss (ECF No. 26) should be granted as to those claims.

> c.  **Plaintiffs' LPLA claims as to inadequate warnings about potential defects are preempted.**

Plaintiffs claim Biotronik provided inadequate warnings as to the potential defects in the product:

> (1) The product lacked an adequate warning because it failed to advise physicians and end users of the device that the elective replacement indicator would not provide sufficient warning of the impending failure to the device and that the battery was susceptible to premature depletion.
>
> (2) The product lacked an adequate warning because it did not advise physicians and end users of the device of the foreseeable complication of lithium plating and advise users to monitor devices for the detectable indicators of lithium plating and/or recommend prophylactic replacement.

In a failure to warn case, the claimant bears the burden of establishing that "at the time the product left the manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product." LSA–R.S. 9:2800.57(A). LSA–R.S. 9:2800.53(9) provides:

> An "adequate warning" means a warning or instruction that would lead an ordinary reasonable user or handler of a product to contemplate the danger in using or handling the product and either to decline to use or handle the product or, if possible, to use or handle the product in such a manner as to avoid the damage for which the claim is made.

*See Fields v. Walpole Tire Services, L.L.C.*, 45,206 (La. App. 2d Cir. 5/19/10), 37 So.3d 549, 557–58, *writ den.,* 2010-1430 (La. 10/1/10), 45 So.3d 1097.

Plaintiffs' assert LPLA claims for failure to provide adequate warnings with the device at the time it left Biotronik's control.  Those claims question the sufficiency of the FDA-approved labeling, warnings, and instructions for the device, or require Biotronik to have included different warnings, labels, or instructions with the device. *See Hughes*, 631 F.3d at 769; *Gomez,* 442 F.3d at 931 ("To permit a jury to decide [plaintiff's] claims that the information, warnings, and training material the FDA required and approved through PMA process were inadequate under state law would displace the FDA's exclusive role and expertise in this area and risk imposing inconsistent obligations on [the defendant].").   Therefore, Plaintiffs' claims for inadequate warnings as to potential defects are expressly preempted by the MDA.

> ### d.  <u>Plaintiffs' claims as to Biotronik's failure to comply with federal regulations for documentation and notification to the FDA of adverse events alleges an LPLA claim for failure to warn that is not preempted.</u>

Plaintiffs assert that Biotronik violated the Medical Device Reporting regulations and post-approval reporting requirements by failing to timely notify the FDA of observed instances of lithium plating and resulting premature battery depletion in Iperia AICD devices and failing to establish a policy for documenting adverse events and report them to the FDA.  ECF No. 25, ¶ 15(h).  Plaintiffs further allege that, "[i]n 2016, after Biotronik received FDA approval and began selling the

Iperia DR-T devices, it received a letter of warning from the FDA finding . . . that there were deficiencies in Biotronik's medical device reporting procedures in that the procedures failed to set forth how adverse events were documented and reported to ensure access to the FDA, . . . and that Biotronik failed to notify the FDA in a timely manner of a serious device malfunction."  ECF No. 25, ¶ 6.

A manufacturer has a duty to report adverse events involving its product in a timely manner to the FDA.  21 U.S.C. § 803.50-803.56.  A parallel claim for inadequate warning exists under Louisiana Revised Statute § 9:2800.57(C) when: "[a] manufacturer of a product who, after the product has left his control, acquires knowledge of a characteristic of the product that may cause damage and the danger of such characteristic, or who would have acquired such knowledge had he acted as a reasonably prudent manufacturer, is liable for damage caused by his subsequent failure to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product."  *See Gavin,* 2013 WL 3691612, at *12-*13.

In *Hughes*, 631 F.3d at 770-71, the Fifth Circuit found that "[a] factfinder could infer that a manufacturer's failure to provide this information as required by FDA regulations is a parallel violation of the state duty to provide reasonable and adequate information about a device's risks.  Thus, we are satisfied that [the plaintiff's] failure to warn claim is not expressly preempted to the extent that it is based on [the manufacturer's] violation of applicable FDA regulations requiring accurate reporting

28

of serious injuries and malfunctions of the HTA device.  This claim does not impose additional or different requirements to the federal regulations, but is parallel to the federal requirements." *See Gavin*, 2013 WL 3791612, at *13.

In *Gavin*, the district court also found the LPLA recognizes that a manufacturer has a duty to use reasonable care to provide an adequate warning to users and handlers of the device if it knows or should have known that the device presents a serious risk of harm even after the device has left the manufacturer's control.  Because Gavin alleged that Medtronic violated the analogous duties owed under the federal regulations to report adverse events, the court found he had adequately stated a valid parallel claim.  *See Gavin*, 2013 WL 3791612, at *14.

In this case, the Armstrongs have alleged a valid state law claim that Biotronik violated its duties to document and report adverse events to the FDA and that those failures may have caused or contributed to David Armstrong's injuries or death. Therefore, Plaintiffs' have adequately alleged a parallel state law claim for failure to warn that is not expressly preempted by the MDA.  And because Plaintiffs assert their claims under the LPLA, their claims are not subject to implied preemption.

> e.    <u>**Plaintiffs' express warranty claim should be dismissed.**</u>

Plaintiffs also assert an express warranty claim:

> The product did not conform to the manufacturer's express warranty about the longevity of the product because the device did not last up to 11 years as represented by the manufacturer.

An express warranty exists where the manufacturer of a good voluntarily undertakes and extends a guarantee to customers.  *See Aucoin v. Amneal Pharmaceuticals, L.L.C.*, 2012 WL 2990697, at *9 (E.D. La. 2012) (*citing Fields v. Walpole Tire Service, L.L.C.*, 37 So.3d 549, 557 (La. App. 2d Cir. 2010), writ den., 2010-1430 (La. 10/1/10), 45 So. 3d 1097).  Under the LPLA, a manufacturer may be liable if a product contains an express warranty that has "induced the claimant or another person or entity to use the product and the claimant's damage was proximately caused because the express warranty was untrue." *See Aucoin,* 2012 WL 2990697, at *10 (citing La. R.S. 9:2800.58).

"The essence of an express warranty claim is a broken promise.  When the promise was one the FDA approved, tort liability for breaking it would conflict with the FDA's view that the representation was a sound one.  So when a claim challenges a representation the FDA blessed in the approval process, it is preempted." *Wildman v. Medtronic, Inc.*, 874 F.3d 862, 867–68 (5th Cir. 2017) (citing *Gomez v. St. Jude Medical Daig Division, Inc.*, 442 F.3d 919, 931-32 (5th Cir. 2006) (holding that a breach of express warranty claim was preempted when the warranty was part of a medical device's "Instructions for Use" that was reviewed and approved by the FDA)).

"But when a claim challenges an express warranty that goes above and beyond any guarantee the FDA expressly or implicitly approved, it is a parallel one." *See id.* "It is parallel because . . . federal law requires that representations about medical devices be truthful.  This comes from the Food, Drug, and Cosmetic Act's prohibition

30

on the sale of 'any . . . device . . . that is adulterated or misbranded.'" *Wildman*, 874 F.3d at 868 (*citing* 21 U.S.C. § 331). "A device is misbranded if it is sold using 'false or misleading advertising.'" *Wildman*, 874 F.3d at 868 (*citing* 21 U.S.C. § 352(q)(1)).

Plaintiffs allege only that "[t]he marketing materials for the Iperia 7 DR-T boasted that Biotronik ICDs have a device life span of up to 11 years." ECF No. 25,¶ 9. It is not shown whether the FDA reviewed and approved Biotronik's marketing materials. Nor have Plaintiffs shown the terms of the warranty approved by the FDA, if any. Therefore the Court cannot determine whether this claim is expressly preempted.[17] *See Naquin*, 2021 WL 4848838, at *3 (*citing Wildman,* 874 F.3d at 866).

Because Plaintiffs assert their claim under the LPLA, it is not impliedly preempted.

However, Plaintiffs have not adequately alleged their claim for an express warranty violation. An express warranty claim must be alleged "with particularity," pleading the specifics of the warranty. *See Reddick,* 2022 WL 715494, at *4; *Wildman*, 874 F.3d at 870. Plaintiffs' pleadings fail to identify the terms of the purported warranty in the marketing materials, or show what warranty terms the FDA approved. *See id.* Therefore, Plaintiffs' express warranty claim should be dismissed without prejudice as conclusory and vague.

---

[17] As part of the PMA, the FDA reviews a device's labeling (including its manual) to ensure it is neither false nor misleading. *See Wildman*, 874 F.3d at 866.

### E.   Plaintiffs' Motion for limited discovery should be denied.

In response to Biotronik's Motion to Dismiss, Plaintiffs ask the Court for an opportunity to conduct limited discovery in order to amend their Complaint.  ECF No. 30.

Because the Court finds some of Plaintiffs' claims are not preempted, and that amendment would be futile as to the claims that are expressly preempted – failure to warn of potential defects and defective design – Plaintiffs' Motion for limited discovery should be denied.  Regular discovery may be conducted.

## III.  Conclusion

Based on the foregoing, IT IS RECOMMENDED that Biotronik's Motion to Dismiss the Complaint (ECF No. 26) be GRANTED IN PART AND DENIED IN PART, as follows:

IT IS RECOMMENDED that Biotronik's Motion to Dismiss Plaintiffs' claims for unreasonably dangerous construction and composition (manufacturing) (ECF No. 26) be DENIED.

IT IS RECOMMENDED that Biotronik's Motion to Dismiss Plaintiffs' claims for design defects (ECF No. 26) be GRANTED and those claims be DISMISSED WITH PREJUDICE as expressly preempted.

IT IS RECOMMENDED that Biotronik's Motion to Dismiss Plaintiffs' claims for inadequate warnings as to potential defects in the product (ECF No. 26) be GRANTED and those claims be DISMISSED WITH PREJUDICE as expressly preempted.

IT IS RECOMMENDED that Biotronik's Motion to Dismiss Plaintiffs' claims for inadequate warnings due to failure to comply with FDA procedures for documentation and notification of adverse events (ECF No. 26) be DENIED.

IT IS RECOMMENDED that Biotronik's Motion to Dismiss Plaintiffs' express warranty claim (ECF No. 26) be GRANTED and that claim be DISMISSED WITHOUT PREJUDICE as conclusory and vague.

IT IS FURTHER RECOMMENDED that Plaintiffs' Motion for limited discovery (ECF No. 30) be DENIED.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. No other briefs (such as supplemental objections, reply briefs, etc.) may be filed. Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers at Alexandria, Louisiana on this
____21st____ day of August 2023.

Joseph H.L. Perez-Montes
United States Magistrate Judge